**Willene DANIELS**

v.

**Charles Z. WICK, Director, U.S. Information Agency, et al., Appellants.**

**No. 86–5234.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1987.

Decided Feb. 27, 1987.

Diane M. Sullivan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Asst. U.S. Attys. and Merry A. Lynn, Atty., U.S. Information Agency, Washington, D.C., were on brief, for appellants.

Beth S. Slavet, Washington, D.C., for appellee.

Before WALD, Chief Judge, STARR, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

The issue in this case is whether the Foreign Service Act of 1980 (Act) permits the foreign service grievance board to order a tenured, career appointment as a remedy for violation of the rights of a nontenured limited term appointee. The grievance board in the case of Willene Daniels decided that tenure was the only adequate remedy for the hostile treatment Daniels had received at the hands of one of her superiors during her limited appointment, which "prevented [her] from carrying out her duties." Def.App. at 46. The Acting Director[1] of the United States Information Agency (USIA or agency) refused to implement the recommendation of the grievance board on the ground that the Act requires that all tenure appointments be made upon recommendation by a tenure board. The District Court disagreed with the Acting Director and ordered him to follow the grievance board's recommendation. We hold that the Act requires all career appointments to be made upon recommendation of a tenure board; accordingly, we reverse the District Court and remand the matter to it with an order to reinstate the Acting Director's veto of the grievance board's recommendation.

## I. BACKGROUND

### A. *The Foreign Service Act of 1980*

The Foreign Service Act of 1980, 22 U.S.C. §§ 3901–4173 (1982 & Supp. III 1985), provides that

(a) [b]efore receiving a career appointment in the Service, an individual shall first serve under a limited appointment as a career candidate for a trial period of service prescribed by the Secretary. During such trial period of service, the Secretary shall decide whether—

(1) to offer a career appointment to the candidate under section 3943 of this title, or

(2) to recommend to the President that the candidate be given a career appointment under section 3942 of this title.

(b) Decisions by the Secretary under subsection (a) of this section shall be based upon the recommendations of boards, established by the Secretary and composed entirely or primarily of career members of the Service, which shall evaluate the fitness and aptitude of career candidates for the work of the Service.

22 U.S.C. § 3946. The limited appointment that a career candidate must first serve "may not exceed 5 years in duration and ... may not be extended or renewed." 22 U.S.C. § 3949.

The Act also provides a generous grievance procedure, under the aegis of the grievance board that "shall consist of no fewer than [five] members who shall be independent, distinguished citizens of the United States, well known for their integrity, who are not employees of the Department or members of the Service." 22 U.S.C. § 4135(a). The makeup of the grievance board is in marked contrast to that of tenure boards, which are "composed entirely or primarily of career members of the Service." 22 U.S.C. § 3946(b). If the grievance board finds that a grievance is meritorious, it may "direct the Department to retain in the Service a member whose separation would be in consequence of the

---

1. The foreign service operates under the auspices of various departments and agencies. Since the service is coordinated through the Department of State, the Act refers to the "Secretary"—meaning the Secretary of State—when describing various powers and duties. However, the Act also explicitly contemplates that other departments and agencies will make personnel decisions affecting foreign service employees under their control. *See* 22 U.S.C. § 3922(b). In this case, the United States Information Agency, headed at the time by Acting Director Gilbert A. Robinson, served as plaintiff Daniels' foreign service employer. Throughout this opinion, we shall use "Secretary" when referring to the statutory provisions themselves, and "Acting Director" when referring to the specific facts of this case.

matter by which the member is aggrieved." 22 U.S.C. § 4137(b)(3). Additionally,

> [i]f the Board finds that the grievance is meritorious and that remedial action should be taken that relates directly to promotion or assignment of the grievant or to other remedial action not otherwise provided for in this section, or if the Board finds that the evidence before it warrants disciplinary action against any employee of the Department or member of the Service, it shall make an appropriate recommendation to the Secretary.... The Secretary shall implement the recommendation ... except to the extent that ... the Secretary rejects the recommendation in whole or in part on the basis of a determination that implementation of the recommendation would be contrary to law....

22 U.S.C. § 4137(d).

### B. *The Proceedings in this Case*

Plaintiff Willene Daniels began her foreign service work with the USIA as a limited term appointee in February, 1978, and that November started her first overseas assignment, in Brasilia. In September, 1980, she embarked upon her second assignment, this time in Georgetown, Guyana. Unfortunately, problems developed between Daniels and her supervisor in Guyana, and she was transferred back to Washington in April, 1981. Just before this transfer, Daniels had received a negative officer evaluation report (OER) from her Guyana supervisor. Daniels filed a grievance concerning her treatment and evaluation by the supervisor. She requested 1) a finding that the OER was falsely prejudicial, 2) expungement of the OER, 3) extension of her limited appointment by two years, during which she might compete for tenure, 4) promotion to a higher-ranked class, 5) reimbursement for certain out-of-pocket expenses incurred as a result of her shortened tour, 6) reimbursement of expenses connected with her son's education,

and 7) disciplinary action against her supervisor in Guyana.

The agency on January 7, 1982, agreed to expunge the OER and to pay expenses connected with her son's education, but denied all other requested relief. Unsatisfied with this response from the agency, Daniels appealed to the grievance board on January 19, 1982, with regard to each denial, and added requests for an overseas assignment, attorneys' fees and costs, and an immediate career (tenure) appointment.

On August 13, 1982, the board ordered that Daniels be reimbursed for a portion of her out-of-pocket expenses and for fees and costs, but denied her request for promotion and discipline of her supervisor. Importantly, it did recommend that Daniels be granted immediate tenure. The recommendation for tenure, made pursuant to 22 U.S.C. § 4137(d), which authorizes the grievance board to recommend relief "not otherwise provided for" in that section, was based on the board's conclusion that Daniels would not be able to demonstrate her fitness for a career appointment through appropriate performance in crucial overseas assignments, since her maximum five-year limited appointment, *see* 22 U.S.C. § 3949, *supra*, had run its course.[2]

On September 13, 1982, the Acting Director of the agency rejected the tenure recommendation on the ground that it was "contrary to law," specifically, to the requirement of 22 U.S.C. § 3946 that career appointments be made upon recommendation of a tenure board. The Acting Director also noted that he lacked power to extend Daniels' appointment, due to the language of 22 U.S.C. § 3949, which expressly limits the pre-tenure trial period to five years. He did, though, petition the grievance board for her retention in the service for a period long enough to demonstrate her fitness for a career appointment through another overseas assignment. He

**2.** The grievance board in at least two other cases has recommended tenure pursuant to its perceived broad remedial powers. Bonilla and the Department of State II, R.O.P. G–83–025–State–16 (Feb. 15, 1985), *appeal filed*, C.A. No. 85–2421 (D.D.C. July 29, 1985), Pl.Supp.App. at

3; *Ehrman v. United States*, R.O.P. No. 6–81–005–State–4 (July 20, 1981), *remanded on other grounds*, C.A. No. 82–1984, slip op. (D.D.C. Aug. 31, 1983), *vacated and remanded as compromised and settled*, C.A. No. 83–2169 (D.C.Cir. Mar. 29, 1984), Pl.Supp.App. at 26, 48.

believed that the board could order such an extension under 22 U.S.C. § 4137(b)(3), which specifically provides for retention in the foreign service of "a member whose separation would be in consequence of the matter by which the member is aggrieved."

The board ordered the extension of Daniels' limited assignment on January 29, 1983, and she began serving in Bombay, India for a three-year tour commencing February 4, 1983. Daniels meanwhile instituted this action on May 19, 1983, seeking review of the board's denial of her attorneys' fees and of the Acting Director's rejection of the board's tenure recommendation.[3] On September 25, 1985, after Daniels had completed two-and-a-half years of her Bombay assignment, a tenure board recommended against Daniels' receiving a career appointment.

In the meantime, Daniels' civil action to reinstate the grievance board's 1982 tenure recommendation was still pending, and on December 12, 1985, the District Court reversed the Acting Director and ordered the agency to implement the recommendation. The court held that a grievance board has authority to recommend tenure as a remedy, under the language of § 4137(d), which grants the board authority to take "other remedial action not otherwise provided for in this section." If the Act gives the griev-

ance board authority to recommend tenure, the court reasoned, then Congress "assumed that the Secretary could implement the recommendation." Def.App. at 30. The court also relied on a previous case in which the Secretary of State had accepted the grievance board's recommendation of tenure for a foreign service limited term appointee. *Ehrman v. United States,* R.O.P. No. 6–81–005–State–4 (July 20, 1981), *remanded on other grounds,* C.A. No. 82–1984, slip op. (D.D.C. Aug. 31, 1983), *vacated and remanded as compromised and settled,* C.A. No. 83–2169 (D.C. Cir. Mar. 29, 1984), Pl.Supp.App. at 26, 48.[4] The court additionally referred to a House Report that states that "[t]ogether with the safeguards of the grievance procedure established in chapter 11, [the tenure board procedure] helps to insure that individuals will not be tenured or fired on the whim of a single individual." H.R.Rep. No. 992, 96th Cong., 2d Sess. 32 (1980). Finally, the court concluded that since the Acting Director had assumed that 22 U.S.C. § 4137(b)(3), which authorizes the grievance board to retain in the service an individual who would otherwise be separated illegally, could override the explicit prohibition in 22 U.S.C. § 3949 against extending limited appointments beyond five years, then the catchall "other remedial action not otherwise provided for in this section" in 22

3. The agency had agreed to extend Daniels' limited appointment without prejudice to her right to seek judicial review with respect to the Acting Director's veto of the grievance board's tenure recommendation. *See* Def.App. at 60–61.

4. The *Ehrman* case does cause us some concern. Ehrman had been turned down by a tenure board three times, in 1979, 1980, and 1981. It is unclear whether the 1980 tenure decision was made before or after the passage of the Act, but what is clear is that information that should not have been in Ehrman's file was considered on all three occasions. The grievance board, reviewing this issue, recommended that Ehrman be given tenure, and the Secretary of State accepted this recommendation. On its face, then, *Ehrman* appears to be a State Department interpretation of grievance board authority that is directly at odds with the USIA's interpretation.

Nonetheless, the USIA argues that the case is distinguishable because Ehrman was, prior to his grievance, "already a *tenured* member of the Foreign Service." Def.Br. at 15 (emphasis in original). At oral argument, USIA counsel explained that before the 1980 Act an officer who

already held career appointee status but who was seeking a certain higher grade by a certain time was said to be seeking "tenure." If counsel is correct, then indeed *Ehrman* is readily distinguishable, because the critical decision to grant career status would not have come before the grievance board. However, it is clear from reading the *Ehrman* grievance board decision that, although the events of the case did arise prior to the effective date of the 1980 Act, the grievance board's decision and accompanying tenure recommendation were issued on July 20, 1981, after the passage of the Act. The grievance board appears to have relied on the 1980 Act in its decision, although it did not discuss § 3946, regarding career appointments. *See* Pl.Supp.App. at 37–40.

The *Ehrman* case remains a cloud on the USIA's claim to consistency of interpretation of the Act. This is not fatal to its case, however, since we ultimately find in the language of the Act itself a bar to the grievance board's award of tenure as a remedy.

U.S.C. § 4137(d) should similarly override 22 U.S.C. § 3946, which requires that tenure decisions be based on the recommendation of a tenure board. This appeal followed.

## II. DISCUSSION

### A. *Tenure and Grievance Provisions in the Act*

#### 1. *The Career Appointments Provision: Text*

The central question is whether the Act unequivocally requires that all tenure recommendations be made by a tenure board, or whether in certain circumstances the grievance board may recommend the award of tenure as a necessary remedy to make whole a nontenured employee who has been critically impaired by a superior during her apprenticeship period. Section 3946, entitled "[c]areer appointments," requires a tenure candidate first to serve a limited appointment. After this trial period, the Secretary "shall decide whether" a candidate should receive a career appointment.[5] Such decisions by the Secretary "shall be based" upon the recommendation of tenure boards, which are composed "entirely or primarily" of career members of the service.

Defendant USIA's main argument is that § 3946 plainly requires all career appointments to be made upon the recommendation of professionally-composed tenure boards, and that the grievance board, made up of non-service individuals, has no implicit power to recommend tenure for whatever reason. A first reading of § 3946 reveals this argument to be a powerful one. Section 3946 contains three commands: An individual must serve a limited appointment before receiving a career appointment; the Secretary must decide whether or not to offer a career appointment himself or recommend that the President offer one; and such decisions must be based upon the recommendation of a board composed of career service members. The second command is of central importance here; the USIA maintains that by requiring the Secretary to "decide whether" a candidate should receive a career appointment, § 3946 specifically delegates decisionmaking power regarding career appointments to the Secretary (after recommendation from a tenure board) and to no one else.

Daniels' response is grounded in other sections of the Act that grant the grievance board ample authority to remedy foreign service officers' injuries at the hands of their superiors. But in order to gain any mileage from those other provisions, Daniels must first explain why § 3946 is not in itself dispositive. She argues that because § 3946 does not explicitly say that *only* the Secretary can decide whether or not to offer or recommend a career appointment, it leaves open the possibility that another decisionmaker pursuant to powers granted elsewhere in the statute is authorized under certain circumstances to make the tenure decision. In short, Daniels maintains that the absence of a specific bar to another decisionmaker making career appointments is evidence of congressional intent to open an alternative avenue for gaining tenure, so long as that power can reasonably be inferred from a more general grant of authority to a different decisionmaker.

#### 2. *The Career Appointments Provision: Committee Reports*

In support of her argument that a tenure board is not the exclusive route to a career appointment, Daniels points to the discussions of § 3946 contained in the relevant House Reports. The House Committee on Foreign Affairs concluded its analysis of § 3946 by stating that "[t]ogether with the safeguards of the grievance procedures established in chapter 11, this procedure [of tenure board recommendation to the Secretary] helps to insure that individuals will not be tenured or fired on the whim of a single individual." H.R.Rep. No. 992, Part 1, 96th Cong., 2d Sess. 32 (1980). Similarly, the House Committee on Post Office

---

**5.** The Act provides either for the Secretary to offer the career appointment directly, *see* § 3946(a)(1) & § 3943, or for the Secretary to recommend to the President that the candidate be given a career appointment, *see* § 3946(a)(2) & § 3942.

and Civil Service wound up its exegesis of § 3946 by commenting that "[t]ogether with the safeguards of the grievance procedures established in Chapter 11, this procedure helps to ensure that appointment decisions will not be arbitrary." H.R.Rep. No. 992, Part 2, 96th Cong., 2d Sess. 53 (1980).

Daniels argues that the language in these Reports indicates a congressional intention that tenure decisions be made either by the Secretary upon recommendation of a tenure board *or* by the grievance board. The seminal sentence upon which Daniels relies from the Foreign Affairs Committee Report occurs at the end of a paragraph extolling peer review of career candidates. That sentence seems to us to focus on the value of having a group of people, rather than a single person, make key personnel decisions. That is, the sentence emphasizes that the tenure *board* process ensures that someone will not be tenured "on the whim of a single individual," while the grievance *board* process ensures that someone will not be fired "on the whim of a single individual."

The Post Office and Civil Service Committee Report is worded somewhat differently, and refers to "appointment decisions" rather than individuals being "tenured or fired." Although Daniels does not make this precise point, it could be argued that "appointment decisions" refers only to tenuring and not to firing, and therefore that the Post Office and Civil Service Committee contemplated tenure board *and* grievance board involvement in the *tenuring* process. Nonetheless, we do not read this difference in wording as indicative of a relevantly distinct meaning. A comparison of the entire section-by-section analysis of the bill in the two Reports reveals a striking similarity in diction; the Reports appear to be the product of the same authors, or one may have been the basic source for the other. Thus, we have difficulty reading the phrase "appointment decisions will

not be arbitrary" as expressive of an intent markedly different from the phrase "individuals will not be tenured or fired on the whim of a single individual." In both cases it is the provision for group review, rather than single-individual decisionmaking power, that provides the assurance against "arbitrary" decisions. In that sense, both tenuring and firing decisions are subsumed within the phrase "appointment decisions."

In any case, we would be reluctant to grant too much weight to a single line from one Committee Report. Construing the reference to "appointment decisions" in the Post Office and Civil Service Committee Report as referring solely to tenuring (not to firing) still leaves open the possibility that the grievance board's role was to be limited to ensuring that the grounds of tenure board recommendations are appropriate, and not to recommending tenure itself. *See* part II.B.2., *infra*. Finally, there is no mention of tenure as a grievance board remedy in § 4137, suggesting that Congress never translated any amorphous thoughts some of its members might have had about grievance board power to recommend tenure into specific statutory authority to do so.[6]

### 3. *The Grievance Board Decisions Provision*

Thus, Daniels' arguments must overcome the fact that the grievance provisions themselves do not expressly contemplate career appointments as part of the grievance board's remedial power. Section 4137(d), pursuant to which the grievance board recommended tenure for Daniels, permits the board to "make an appropriate recommendation to the Secretary" that "remedial action should be taken that relates ... to other remedial action not otherwise provided for in this section."

Daniels is correct in arguing that this provision is open-ended, and does not *exclude* tenure recommendations.[7] Addition-

---

6. Neither the Senate Report nor the Conference Report contains any counterpart language to the House Reports linking grievance board and tenure board procedures.

7. The legislative history does reveal a congressional intention to create a strong and independent grievance board system. A House Report indicated that "the committee intends this legislation to reaffirm the independence and increase the authority of the Board." H.R.Rep.

ally, Daniels maintains that in certain unusual circumstances, such as hers, *only* a recommendation of tenure by the grievance board will make the grievant's injury whole. Accordingly, even an extended appointment, which was the Acting Director's method for making Daniels whole, might not remove the lingering taint on Daniels' record. Despite the expungement of the negative OER, a future tenure board reviewing her case might be adversely influenced, perhaps even subconsciously, by the fact that she has come up for review well after the others in her entering class and after an extra tour of duty.

Our response is informed by § 4137(d)'s provision that the Secretary may reject the recommendation of the grievance board if it "would be contrary to law"; hence, we come full circle to the first question of whether a tenure recommendation by the grievance board *is* actually contrary to law. Indeed, the Acting Director relied on this "contrary to law" provision in rejecting the Daniels' grievance board tenure recommendation, opining that § 3946 provided the sole basis for career appointments.[8] The reconciliation of §§ 3946 and 4137(d) is thus aided by § 4137(d)'s reminder that the Secretary may decline to follow the grievance board's recommended remedy, if the power to implement the remedy is delegated exclusively to another decisionmaker. That leads us back inevitably to the dispositive issue of whether § 3946 constitutes an exclusive delegation of the power to grant tenure to a tenure board.

### 4. The Career Appointments Provision Revisited: Why a Tenure Board is Required for a Tenure Award

We find in the end that § 3946 is the exclusive route to a tenure appointment, even in unusual cases such as Daniels' where a grievance board recommendation of tenure might seem the best method of making the grievant whole. First, the carefully detailed procedures of § 3946—limited appointment, recommendation by tenure board, decision by Secretary—militate against an inference that Congress intended, without explicitly saying so, for these procedures to be bypassed by the grievance board, even in the exercise of its broad remedial powers.

Second, the tenure boards that recommend career candidates to the Secretary are constituted "entirely or primarily of career members of the Service," while the grievance board is composed of people

No. 992, Part 2, 96th Cong., 2d Sess. 32 (1980). The Conference Report explained that the conference had incorporated a Senate amendment that ensured "that the grievance system should be one that will insure the fullest measure of due process for the members of the Foreign Service." H.R.Conf.Rep. No. 1432, 96th Cong., 2d Sess. 109 (1980).

Finally, Representative Schroeder of Colorado, a co-sponsor of the original House bill and a member of both the House Post Office and Civil Service Committee and the Conference Committee, commented that

[o]ne of the things we tried to do in this legislation and the legislative history was to convey to the Grievance Board the interest of Congress in its independence. The Board *should not see itself as a management body.*

With regard to the definition of a grievance, I think the language of section [4131] provides for a broad range of grievable actions.... The list in [4131(b)] is a list of exceptions and, as such, should be read narrowly by the Grievance Board. Hence, an action should be grievable unless there is a specific, narrow exception in [4131(b)].

With regard to the Secretary's veto over Grievance Board decisions, I think a clear statement of congressional intent should be helpful. The way I see the veto provision working is that the agency head should, except in rare cases, adopt and implement the decision of the Grievance Board.... What has to be conveyed to agency heads is congressional will that the decision of the Board be implemented. I personally would like to know every time an agency head refuses to implement the decision of a Grievance Board. I would like to know from the Department why the veto was exercised. If vetoes were exercised too often in the future, I would try to remove this veto power from the Secretary. 126 Cong.Rec. 28,660 (1980). Despite this unequivocal decision to confer broad powers on the grievance board, the question lingers whether the extraordinary power to award a career appointment is implicitly included therein.

**8.** We find ourselves ultimately in agreement with the position of the Acting Director. *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

"who are not employees of the Department or members of the Service." The difference in board composition says much: Congress meant to ensure that tenured appointment to the select cadre of career foreign service officers would be made only by other career professionals who had the knowledge and experience themselves to recognize which candidates should survive and which should be eliminated.[9] On the other hand, because individual grievances so often involve personality conflicts between officers or candidates and their superiors, Congress thought it wise to provide impartial, non-foreign service arbiters for such disputes.

It is true that the Act authorizes selection boards that include members of the public to make promotion decisions. *See* §§ 4001–4003. Since foreign service officers must be either promoted within a specified period of time or retired (*see* note 10, *infra*), one could maintain that promotion decisions are just as critical to a foreign service career as tenure decisions. If, under the Act, promotion decisions involve nonprofessionals, one could continue, why should we assume Congress did not similarly intend nonprofessionals to be involved in occasional tenure decisions?

There are two basic differences between tenure and promotion decisions under the Act. First, promotion, unlike tenure, does not mark the official entry into the foreign service career corps, but instead only differentiates between the ranks in that corps. Even though a failure to promote may effectively mean separation in some cases, *see* note 10, *infra*, such exit decisions are normally based upon a longer record of service in the corps itself and have less of a predictive quality about them than entry

decisions. Second, and dispositively, the statute *explicitly* provides for members of the public to be involved in promotion decisions, *see* §§ 4001–4003; there is no parallel explication of the grievance board's role in the tenuring process.

In light of these circumstances, we think that Daniels' "make whole" argument must also fail. Ultimately, the contention that only a grievance board tenure award would remedy a grievant's injury in some cases must be judged in light of congressional intention. The Act clearly provides at various points for the involvement of one or another type of procedure for a particular personnel action: We have already looked at § 3946's carefully laid out tenure procedure and §§ 4001–4003's explicit inclusion of public members in the promotion process; footnote 13, *infra*, describes § 4010's express mandate that judgments of separation be grievable. The Act does not, though, even hint at grievance board power to grant tenure. A Congress that was so clear at so many other points is not likely to have intended the extraordinary remedy of a grant of tenure to be implied through broad, unspecific language.

### B. *Other Relevant Provisions in the Act*

#### 1. *Extended Duration of a Limited Appointment*

Daniels points to other apparently inflexible provisions of the Act that actually do have escape hatches. First, Daniels reiterates an argument upon which the District Court relied heavily. The limited appointment provision, § 3949, *explicitly* bars a limited appointment from being extended

---

**9.** The legislative history is replete with references to the highly selective personnel process that guides the foreign service. *See, e.g.,* H.R.Rep. No. 992, Part 1, 96th Cong., 2d Sess. 3, 5, 9 (1980) ("The uniqueness of the Foreign Service is expressed by the requirement that individual members be available for service worldwide throughout their careers. It is a disciplined, professional Service based on a rank-in-person system similar to that followed by the military. In that system, rank and promotions attach to the individual, not to the position as in the civil service system."); (In 1924 "a unified Foreign Service was established as a permanent career service with merit alone to serve as the basis for appointment and promotion."); (intention to strengthen and improve foreign service by "acquisition of career status only by those who have demonstrated their fitness through successful completion of probationary assignments ..."); S.Rep. No. 913, 96th Cong., 2d Sess. 14 (1980), U.S.Code Cong. & Admin.News 1980, pp. 4419, 4431. (same discussion regarding need to demonstrate fitness during limited appointment).

beyond five years; yet, the Acting Director in this case petitioned the grievance board to do exactly that, arguing that it had remedial power under § 4137(b)(3), which permits the board to order the agency to "retain in the Service a member whose separation would be in consequence of the matter by which the member is aggrieved." Daniels argues that if the plain meaning of § 3949 can be overridden by a broad remedial provision like § 4137(b)(3), then the less plain § 3946 should be able to be overridden by the equally broad remedial provision, § 4137(d).

We think that the manifest difference in purpose between §§ 3949 and 3946 refutes Daniels' argument. Section 3949 attempts to implement an "up-or-out" system; as with university faculties or law firms, a non-tenured professional must either receive tenure after a certain period of time or leave the service.[10] Section 3949 stipulates that five years is to be the maximum trial period, but if a limited term appointee has been discriminated against or otherwise improperly denied the chance to show her mettle for a career appointment during those five years, then the number of such "wasted" years ought to be given back, as it were, to that limited term appointee, so that she can have a full five-year term as contemplated by § 3949. Thus, the remedial § 4137(b)(3) merely permits the Secretary, through the grievance board, to override the otherwise harsh consequences of the five-year rule when a limited term appointee has, for all intents and purposes, not been given a full five years to display her abilities.[11]

Section 3946 is quite a different animal. Regardless of the various corrections the grievance board might make to ensure a fair evaluation of a career candidate,

§ 3946 contemplates that ultimately a board composed mainly of career foreign service members will recommend whether or not a limited term appointee should be given tenure. Whereas § 4137(b)(3) came into play here to ensure that Daniels received an unencumbered five-year trial period, as contemplated by § 3949, a use of § 4137(d) to give Daniels tenure would not support any such statutory goal. Indeed, it would actually accomplish the opposite result, ensuring that a board composed primarily of foreign service members would *not* have a say in the Daniels tenure matter. In sum, we agree with the Acting Director that the relationship between §§ 3949 and 4137(b)(3) is materially distinct from that between §§ 3946 and 4137(d).

### 2. *Reviewability of the Basis of a Judgment of Termination*

Daniels' counsel, at oral argument, offered a second example of how a seemingly absolute dictate in the Act can be ameliorated by the grievance board's remedial powers. Section 4011 of the Act provides that the Secretary may "terminate at any time" most limited term appointees. Section 4131(b)(3), likewise, quite plainly states that "the termination of a limited appointment under [§] 4011 of this title" is *not* a grievable matter. Counsel contended that even though, under the terms of the Act, a judgment of termination cannot be the subject of a grievance, the *evidentiary basis* upon which that judgment was made can be.[12] Therefore, Daniels continues, since the grievance board may play a role with regard to judgments of termination that appear to be delegated to another decision-maker, the grievance board was also meant to play a role with regard to tenure decisions.[13]

---

**10.** Even tenure does not guarantee a lifetime job in the foreign service; the selection-out procedure establishes the maximum amount of time someone may serve in a certain class, after which (barring a statutorily-permitted extension) the member must either be promoted or retired from the foreign service. *See* § 4007.

**11.** We assume for purposes of argument that § 4137(b)(3) can override § 3949's term limitation; we do not decide the matter.

**12.** Although we accept for purposes of argument the notion that the grievance board can review the basis for a judgment that cannot itself be the subject of a grievance, we do not decide this issue either.

**13.** Counsel was not entirely clear as to the genesis of this statutory argument. Counsel might have been referring to § 4010, which explicitly provides that a judgment of separation in the case of almost all career appointees and in the case of some limited term appointees is a griev-

Even if counsel were correct that the *basis* of the termination of a limited term appointee is grievable, the remedy would undoubtedly be a remand to the Secretary to reconsider the matter absent the material erroneously considered or the discrimination improperly made. In other words, the remedy would not be for the grievance board to take final action regarding the termination of the limited term appointee, but to ensure that the party authorized by statute to take such action did so on proper grounds. The analogy to Daniels' case should be clear: If Daniels felt aggrieved, and were correct, the grievance board might (and did) put her in a position where she could once again compete on even footing with her peers, but it could not take the final action of granting tenure that § 3946 delegates to the Secretary upon recommendation from a tenure board.

### CONCLUSION

Our disposition of the USIA's appeal determines only that the grievance board's initial tenure recommendation was inappropriate and that the Acting Director acted properly in rejecting it. Daniels has since been turned down for tenure by a tenure board; nothing we say in this opinion has any bearing on what remedies, if any, Daniels may have with regard to that tenure board decision.

Accordingly, the judgment of the District Court is

*Reversed,* and remanded to the District Court with instructions to reinstate the Acting Director's veto of the grievance board's tenure recommendation.

---

able matter. *See also* § 4131(a)(1)(A) ("grievance" includes "separation"). But since these sections of the statute provide, on their face, for a grievance procedure to review the judgment of separation of career officers, their very explicitness would cut against Daniels, because no comparable statutory provision expressly provides for grievance board authority to grant tenure as a remedy. Daniels' counsel probably was referring to § 4011, though, regarding termination of limited term appointees. We respond to that argument in the text.